**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**　　　　　　　　　　　　　　　**Criminal Case No.: 1:21-CR-14**
　　　　　　　　　　　　　　　　　　**(JUDGE KLEEH)**

**ALANTE MARTEL NELSON,**

       **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 31] BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant's Motion to Suppress Evidence Obtained in Violation of Mr. Nelson's Fourth Amendment Rights [ECF No. 31], filed on September 3, 2021. By Order dated September 7, 2021 [ECF No. 32], United States District Judge Thomas S. Kleeh referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's Response to the Defendants' Motion to Suppress Evidence, filed on September 10, 2021. [ECF No. 35]. The undersigned conducted a hearing on Defendant's motion on September 13, 2021, at which the Court heard witness testimony and accepted exhibits into evidence. Thereafter, on September 16, 2021, Defendant filed a reply [ECF 38] to the Government's response.[1] The Government filed a surreply on September 17, 2021. [ECF No. 39].

---

[1] At the suppression hearing on September 13, 2021, the Court provided a deadline to Defendant of September 15, 2021 to supplement his written argument. The Government, in its surreply, argues that the Court should strike Defendant's reply as untimely. The undersigned notes the Government's argument but declines to take such action.

Based on a detailed review of Defendant's motion [ECF No. 31], the Government's response [ECF No. 35], the exhibits introduced into evidence at the hearing on Defendant's motion, the testimony given by witnesses at said hearing, Defendant's reply [ECF No. 38] to the Government's response, and the Government's surreply [ECF No. 39], the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Alante Martel Nelson ("Defendant") stands accused in a two-count indictment which a Grand Jury returned against him on February 2, 2021. [ECF No. 1].  Defendant is named in the Indictment with the offenses of (1) Possession with Intent to Distribute Cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and (2) Unlawful Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

Defendant was detained by the Morgantown, West Virginia Police Department ("MPD") in the early morning hours of August 21, 2020. At this time, MPD officers responded to a call of shots fired in the area of downtown Morgantown. The description of the shooter relayed by dispatch to officers was that of a black male with a tan shirt. MPD officers spotted Defendant, who was on foot, in the area of Wall Street, in the vicinity of Fourth and Goal bar, in downtown Morgantown. Defendant is a black male and at the time was wearing a tan shirt, and officers found him close in place and time to the location where shots fired were reported. MPD officers detained Defendant and attempted to pat him down. Defendant was belligerent and uncooperative with officers, and thus was arrested for obstruction, public intoxication, and disorderly conduct.

Incident to Defendant's arrest, officers searched Defendant's person. From this search, they found (1) a white, powdery substance that field tested positive for cocaine, in the amount of 12.4 grams, (2) $2,980.00 in United States currency, and (3) a pistol in Defendant's back right pocket,

which was a black Ruger, model LCP, .380-caliber, with one round in the chamber and the magazine empty. Immediately after Defendant's arrest, an officer located two spent shell casings on the sidewalk on a nearby street, which were the same caliber and manufacture as that which officers recovered from the pistol located on Defendant. The next day, August 22, 2020, MPD officers recovered an additional firearm from the room which Defendant had been occupying at a nearby hotel. The additional firearm was a loaded Taurus 9mm pistol, model G2C, bearing serial number TMT14867.

Law enforcement eventually determined Defendant previously was convicted for felony drug offenses in a state court in Virginia and in this Court, respectively, giving rise to the "felon in possession" charge pending in the instant matter.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on September 13, 2021, the Court heard sworn testimony from four witnesses, namely, (1) Special Agent Heather Kozik ("Kozik") of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, (2) Patrolman First Class Alexandra Arthurs ("Arthurs") of MPD, (3) Master Patrolman Zachary J. Trump ("Trump") of MPD, and (4) Sergeant Lawrence E. Hasley ("Hasley") of MPD. The Court also received into evidence the following:

1.  Government's Exhibit A, the Computer Aided Dispatch ("CAD") report from the events at issue, reflecting radio communications involving responding officers as generated by the Monongalia County, West Virginia, Homeland Security Emergency Management Agency [ECF No. 37-1];

2.  Government's Exhibit B, Kozik's first "Report of Investigation" and associated attachments concerning the events at issue [ECF No. 37-2];

3.  Government's Exhibit C, Kozik's second "Report of Investigation" and associated attachments concerning the events at issue [ECF No. 37-3][2];

4.  Government's Exhibit D, a Chemical Analysis Report generated by the United States Department of Justice, Drug Enforcement Administration, concerning the substance found on Defendant during the search incident to his arrest [ECF No. 37-4];

5.  Government's Exhibit E, a DVD containing video footage from the body cameras worn by four of the MPD officers involved in the events at issue here – Officers Arthurs, Hasley, Scott and Bradford [ECF No. 37-5]; and,

6.  Government's Exhibit F, video footage from the body camera worn by a fifth MPD officer involved in the events at issue here, namely that of Trump. [ECF No. 37-6].

### A. Kozik's Testimony

The Government called Kozik to testify. Kozik was called only for the purpose of authenticating the Government's exhibits, which were admitted into evidence without objection.

### B. Arthurs' Testimony

The Government called Arthurs to testify. According to her testimony,[3] Arthurs was working the midnight shift in the early morning hours of August 21, 2020. [9:00:00 to 9:00:06]. Arthurs heard a call over her radio via 911 dispatch regarding shots fired in the area of Walnut Street in Morgantown. [9:00:15 to 9:00:39]. The call concerned a black male wearing a tan shirt who had fired a pistol into the air multiple times. [9:00:40 to 9:00:47]. The shots were reported to

---

[2] Kozik generated the second report to include later-acquired information about the second firearm associated with Defendant being recovered from the room of a nearby hotel which Defendant had been occupying at the time of his arrest.

[3] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on September 13, 2021, which is located on the section of the Court's intranet site for FTR recordings.

be in the area of the Fourth and Goal bar. [9:00:48 to 9:00:54]. The Fourth and Goal bar is located at 234 ½ Walnut Street in downtown Morgantown, which is an area comprised mostly of shops, restaurants, and bars. [9:00:55 to 9:010:28].

Arthurs explained the pertinent street names and locations, and flow of traffic, in downtown Morgantown. [9:01:36 to 9:02:19]. Most of the downtown streets are one-way, and the streets (or at least the portions thereof) described here are one-way. Id. High Street runs north to south. Walnut Street, running east to west, is perpendicular to High Street. Id. Spruce Street is on one side of High Street and Chestnut Street is on the other side of High Street, both running north to south, parallel to High Street. Id. Thus, in order to travel from the intersection of Walnut Street and Chestnut Street, to the middle of High Street, one would travel on Chestnut Street in a northerly direction, parallel to High Street, to the intersection of a street perpendicular to High Street and then take such a perpendicular street to High Street so as to travel on High Street in the one-way direction to the point of interest on High Street. [9:02:20 to 9:03:20]. Wall Street is not a thoroughfare for driving automobiles but rather is a pedestrian alley. [9:03:21 to 9:03:53]. It runs east to west between Walnut Street and Fayette Street, and bisects High Street approximately in the middle of the segment of High Street at issue here. Id.

Upon hearing the 911 radio call regarding shots fired, Arthurs drove around the downtown area trying to locate the individual described in the call. [9:04:06 to 9:04:20]. In the course of her search, she observed a black male wearing a tan shirt standing at the intersection of Wall Street and High Street.  [9:04:21 to 9:04:31]. She then drove to Chestnut Street and proceeded up Chestnut Street toward its intersection with Wall Street, as she had seen the subject (who officers later determined to be Defendant) begin to walk down Wall Street, in the direction of Chestnut Street and away from Wall Street's intersection with High Street. [9:04:32 to 9:04:44]. Arthurs

parked her vehicle near the intersection of Chestnut Street and Wall Street, and exited the vehicle to approach Defendant on foot. [9:04:45 to 9:04:50]. Arthurs waited for another officer, Officer Bradford ("Bradford"), to arrive to meet her, which he did quickly. [9:05:13 to 9:05:23]. Arthurs waited for Bradford to arrive as a safety measure, given the nature of the call involving shots from a firearm. [9:05:24 to 9:05:36]. Arthurs did not have a partner in her vehicle that night. Id.

Arthurs and Bradford walked up Wall Street, from Chestnut Street towards High Street. [9:05:37 to 9:05:47]. As the two officers were walking, they observed Defendant, accompanied by a couple of other people, walking toward them on Wall Street. [9:05:48 to 9:05:56]. When Defendant saw the two officers, he turned around and began walking quickly in the opposite direction, back toward High Street. [9:05:57 to 9:06:06]. To Arthurs, this was suspicious behavior, because one would not so act if they had not done something wrong. [9:06:07 to 9:06:20]. Arthurs explained that the Wall Street alleyway is illuminated at night by several streetlights, and that she and Bradford were wearing police uniforms. [9:17:30 to 9:17:53].

Arthurs stated that the intersection of High Street and Wall Street is approximately one to one and one-half blocks away from the Fourth and Goal bar. [9:06:21 to 9:06:39]. Arthurs first saw Defendant at the intersection of High Street and Wall Street a few minutes after hearing the call from dispatch concerning shots fired. [9:06:40 to 9:07:02].

While Defendant was walking away from Arthurs and Bradford up Wall Street, other officers were at the other end of Wall Street on High Street. [9:07:03 to 9:07:23]. Arthurs was in contact with the other officers on Wall Street by radio, and she told them she had seen the subject of the 911 call, who was headed in their direction. [9:20:00 to 9:20:25]. Those other officers intercepted Defendant and detained him. [9:07:24 to 9:07:33]. A few moments later, Arthurs and Bradford arrived at the scene of the detention. [9:07:34 to 9:07:41].

Defendant pulled away from officers, yelled and cursed, and was belligerent. [9:07:42 to 9:07:57]. Officers placed Defendant in handcuffs, and Defendant continued to pull away and be uncooperative with officers. [9:07:58 to 9:08:09]. Upon detention of a subject, officers ordinarily would perform a Terry frisk of the subject, but were unable to in these circumstances, given Defendant's refusal to cooperate. [9:08:10 to 9:08:30].

Ultimately, Arthurs decided to arrest Defendant based upon his conduct. [9:09:17 to 9:09:20]. Defendant was charged with public intoxication, disorderly conduct, and obstruction. [9:09:21 to 9:09:25]. Defendant was visibly intoxicated. [9:09:35 to 9:09:37]. Arthurs noted that a small crowd of people were across the street from the scene of the detention filming the events because Defendant was creating such a disturbance. [9:09:38 to 9:09:52].

Upon his arrest, Defendant's person was searched incident to the arrest. [9:09:53 to 9:10:01]. From the search of Defendant's person, officers found (1) a pistol in Defendant's right pants pocket, (2) a bag of a substance in Defendant's right pants pocket which field tested positive for cocaine, (3) a large amount of cash, and (4) two mobile telephones. [9:10:02 to 9:10:26].

Officers attempted to place Defendant in the back of a police vehicle but were unsuccessful in doing so. [9:10:27 to 9:11:32]. Defendant was uncooperative in being placed into the smaller space available in this vehicle. Id. Thus, officers had utilize a different police vehicle with a larger space so as to be able to force Defendant into a vehicle. Id. Officers were needed on both sides of this second vehicle in order to place Defendant into it. Id. Because of Defendant's continued uncooperative conduct, officers could not process him in the usual course at the police station but rather had to utilize a holding facility at a different location. [9:11:33 to 9:11:45].

Arthurs has a computer in her patrol vehicle, and on the computer is a platform which affords her real-time access to a CAD report for a given incident or call. [9:11:46 to 9:12:33].

Arthurs explained that the CAD report here (Government's Exhibit A) contains the name and telephone number of the individual who called 911 to report shots fired. [9:12:34 9:13:00]. The individual is named Jonathan. [9:13:01 to 9:13:04]. Thus, Arthurs stated, if the report of shots fired had been false, law enforcement had the necessary information to follow-up with the person making the report and hold them accountable. [9:13:17 to 9:13:29].

Arthurs explained some contents of the CAD report (Government's Exhibit A). The CAD report identifies responding officers by number. [9:21:28 to 9:22:00]. The responding officers and their corresponding numbers are listed at the bottom of the first page of the CAD report. Id. The command log on the second page incorporates officers' numbers in the entries for specific communications conveyed between dispatch and a particular responding officer. Id. A CAD report may not reflect each and every such radio communication made, especially in there are multiple officers responding and communicating in a quickly-developing situation. [9:25:34 to 9:26:19].

### C. Trump's Testimony

The Government called Trump to testify. Trump testified that he was working the midnight shift on August 21, 2020, and became involved in the events here with Defendant. [9:28:54 to 9:29:08]. Trump got involved because he had made an arrest in a separate incident nearby, was transporting that arrestee to the MPD station, and heard the radio call about shots fired. [9:29:09 to 9:29:31]. Trump exited the police vehicle in which he was travelling, while the partner with whom he was transporting the arrestee continued with the transport. [9:29:32 to 9:29:37]. Trump was travelling on High Street, which was the usual route he would have been taking anyway, given the directional flow of traffic on downtown streets, and exited the police vehicle in the vicinity of the reported shots fired. [9:29:38 to 9:32:30]. Trump knew that the suspect was identified as a

black male wearing a tan shirt. Id. Trump also knew that the reported location of the shots fired near the Fourth and Goal bar on Walnut Street. Id.

Trump heard on his radio that Arthurs and Bradford saw the subject on Wall Street, which is where Trump had exited his police vehicle. [9:33:30 to 9:33:52]. Trump observed Defendant, who matched the description of the subject, walking up Wall Street towards High Street from the direction of Chestnut Street. [9:33:54 to 9:34:10]. Trump saw Arthurs and Bradford at the other end of Wall Street. [9:34:11 to 9:34:25]. Defendant walking away from the other officers in this fashion also was suspicious to Trump. [9:49:18 to 9:49:26]. Trump drew his firearm and instructed Defendant to put his hands up. [9:34:26 to 9:34:35]. Defendant put his hands up at first, but as Defendant continued walking towards Trump, Defendant put his hands down. [9:34:36 to 9:34:44]. Trump grabbed one of Defendant's arms, Bradford arrived and grabbed Defendant's other arm, and the officers placed Defendant in handcuffs. [9:34:45 to 9:34:52].

Trump described Defendant as being irate once he was detained. [9:35:15 to 9:35:39]. Trump stated that Defendant pulled away from officers and screamed at them, and was visibly intoxicated. Id. Officers planned to conduct a Terry stop of Defendant: (1) because he matched the description of the subject for whom officers were looking, (2) because he was walking away from other officers, and (3) because of the nature of the call about shots being fired. [9:35:40 to 9:35:57]. Trump believed Defendant to be armed and dangerous. Id.

Trump described the intersection of High Street and Wall Street, where officers detained Defendant, as being approximately one and one-half blocks from the location of the reported shots fired on Walnut Street, as being [9:35:58 to 9:36:10]. Trump testified that his interaction with Defendant occurred within minutes of the radio call from dispatch about shots fired. [9:36:11 to 9:36:26].

Defendant was not cooperative with officers' efforts to conduct a Terry frisk, and officers were unable to conduct a Terry frisk. [9:36:27 to 9:36:41]. Trump testified that Arthurs decided to place Defendant under arrest for the offenses of public intoxication, disorderly conduct, and obstruction. [9:36:42 to 9:36:56]. Trump searched Defendant incident to arrest and located (1) a wad of United States currency in Defendant's front right pocked, (2) a baggie of a substance suspected to be cocaine, and (3) a Ruger model LCP .380-caliber handgun in Defendant's back right pocket, with a round in the chamber and the magazine empty. [9:37:05 to 9:37:43].

Trump described how officers were unable to load Defendant into the first police vehicle they attempted, because Defendant was so uncooperative. [9:37:45 to 9:38:32]. Officers ultimately were able to load him into a second police vehicle. Id.

### D. Hasley's Testimony

The Government called Hasley to testify. Hasley testified that he was working the midnight shift on August 21, 2020. [9:52:22 to 9:52:27]. Hasley was patrolling downtown Morgantown when he heard a radio dispatch about a black male wearing a tan shirt firing a gun on Walnut Street. [9:52:28 to 9:53:09]. He recognized the area described as being near the Fourth and Goal bar. [9:53:10 to 9:53:26].

Hasley proceeded to the immediate area in his patrol vehicle. [9:53:27 to 9:53:35]. In so doing, he proceeded from his location on Spruce Street, turning left on Walnut Street. [9:53:36 to 9:54:28]. As he proceeded on Walnut Street and intersected with High Street, he looked to the right and saw a black male wearing a tan shirt walking toward Wall Street, who then turned onto Wall Street and walked toward Chestnut Street. Id. Hasley did not proceed on High Street toward Wall Street because that would involve proceeding the wrong way on a one-way street. [9:54:30 to 9:54:38]. Hasley continued to proceed on Walnut Street and turned right on Chestnut Street.

[9:54:39 to 9:55:00]. He drove on Chestnut Street in hopes of intercepting Defendant as he walked down Wall Street toward Chestnut Street. [9:55:35 to 9:55:45].

As Hasley traveled on Chestnut Street, he looked up Wall Street and saw Defendant still standing closer to High Street. [9:56:10 to 9:56:20]. Thus, Hasley decided to continue on Chestnut Street, turn onto Willey Street, proceed to the intersection with High Street, and then turn onto High Street in an attempt to intercept Defendant there. [9:56:21 to 9:57:21]. When Hasley turned onto High Street, he saw another police officer, Sgt. Holder ("Holder"), parked in a patrol vehicle in the lot of a nearby CVS Pharmacy. [9:57:22 to 9:57:47]. Hasley pulled in beside Holder to tell Holder what he had seen and proceed together to where Hasley had seen Defendant. Id. Hasley stated that as he was speaking with Holder in the CVS parking lot, a man approached the passenger side of Hasley's patrol vehicle. [9:58:03 to 9:58:09]. This man told Hasley that he had just witnessed a black male wearing a tan shirt waving a gun around, and that the gun had a laser. [9:58:10 to 9:58:18]. To Hasley, this confirmed the radio communications about shots fired and Hasley's own thought about the suspect he had observed. [9:58:20 to 9:58:29].

Hasley and Holder pulled out of the CVS parking lot and proceeded toward Wall Street, where Hasley had earlier observed Defendant. [9:58:31 to 9:58:45]. Other officers had arrived on the scene and engaged with Defendant. [9:58:49 to 9:59:07]. Hasley observed Trump giving orders to Defendant. Id. Hasley stated that Defendant was not compliant with officers' commands. [9:59:09 to 9:59:17]. Officers placed Defendant in handcuffs. [9:59:18 to 9:59:20]. Defendant was agitated and visibly intoxicated. [9:59:42 to 9:59:51]. Hasley explained that Arthurs decided to arrest Defendant for public intoxication, disorderly conduct, and obstruction. [10:00:20 to 10:00:30].

Hasley stated that he did not know the person who had approached him in the CVS parking lot. [10:08:20 to 10:08:30]. He did not obtain that person's name or contact information. Id. He explained that he did not obtain that person's name and contact information because of the exigency of the situation. [10:11:39 to 10:12:08]. His focus instead was responding to the call about shots fired. Id. He did not convey his contact with this person over the radio, so it is not captured on the CAD report. [10:09:10 to 10:09:25]. Hasley stated that the only people who knew about the person who approached him in the CVS parking lot were himself and Holder. [10:09:56 to 10:10:05].

Hasley speculated that this person was not the same as the person who placed the 911 call. [10:12:17 to 10:12:58]. Hasley concluded this because the 911 caller said they had witnessed the shooting of a firearm, whereas the person who approached Hasley said they had witnessed the subject waving a gun around. Id. To Hasley, this corroborated the information provided by the person who called 911. Id.

Hasley stated that nothing on the CAD report indicates that any officers themselves heard shots fired. [10:10:35 to 10:10:42]. Hasley stated that he was in the vicinity of the area where shots were reported to be fired. [10:06:47 to 10:07:26]. He had not himself heard the shots fired, and given his proximity to the reported location of the shots, he was surprised that he did not hear them. [10:04:49 to 10:05:01].

### III. LEGAL ISSUES AND ANALYSIS

Defendant contends that (1) MPD officers did not have reasonable, articulable suspicion to detain Defendant because of lack of information about the identity and reliability of the person who called 911, and because Arthurs did not convey to her colleagues who detained Defendant the information about Defendant's suspicious behavior on Wall Street in walking away from her, and

(2) MPD officers did not have reasonable, articulable suspicion to detain Defendant because officers in the vicinity did not hear shots fired to corroborate the 911 call. Thus, according to Defendant, evidence obtained here must be suppressed.

On the contrary, the Government argues that the 911 call was reliable and credible because at least one responding officer (Arthurs) had a device by which she could access real-time information on the CAD report, and that this report contained the identity and contact information of the caller reporting shots fired. The Government stresses that officers located Defendant near in place and time to the location of the reported shots fired, and that he matched the description of the subject. Plus, the Government argues that officers themselves need not have seen or heard criminal activity to have reasonable, articulable suspicion to make the investigative stop of Defendant.

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

However, some detentions are permissible short of law enforcement having probable cause to do so. Commonly, this arises for an "investigative stop," when there is at least a reasonable, articulable suspicion that the person has committed a crime. Terry v. Ohio, 392 U.S. 1, 21 (1968). Further, instructive caselaw provides that reasonable suspicion arises from circumstances leading to a stop or search. Ornelas v. United States, 517 U.S. 690, 696 (1996). A court is to review the

13

stop or search "from the standpoint of an objectively reasonable police officer." Id. Specifically, permissible are "brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396 (2014) (citations and quotations omitted). Such a stop is permitted by an officer if he or she "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry, 392 U.S. at 30 (1968).

The Fourth Circuit has articulated: "The reasonable suspicion standard, like the probable cause standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citation omitted). Moreover, "because the Terry reasonable suspicion standard is a commonsensical proposition, '[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." Id. at 782 (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993)).

Further, the Fourth Circuit has specified that "[r]easonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (citations omitted). However, an officer cannot make such a stop based on a mere hunch. Rather, "[t]o justify a stop, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." United States v. Slocum, 804 F.3d 677, 682 (4th Cir. 2015) (citations and quotations omitted). "The level of suspicion must be a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. (citations and quotations omitted).

In addition, the Fourth Circuit has cautioned that the Government "cannot simply proffer 'whatever facts are present, no matter how innocent, as indicia of suspicious activity.'" United States v. Massenburg, 654 F.3d 480, 489 (4th Cir. 2011) (quoting United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011)). Indeed, "[t]he Government 'must do more than simply label a behavior as 'suspicious' to make it so'; rather, the [G]overnment must be able to 'articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" Slocum, 804 F.3d at 684 (quoting Massenburg, 654 F.3d at 491).

Moreover, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). It is the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). Among those few exceptions to the requirement to obtain a warrant is the circumstance where the search of a person is incident to an arrest of that person. "[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area 'within his immediate control.' Davis v. United States, 564 U.S. 229, 232 (2011) (citation and quotation omitted). The policy behind this exception is to remove any weapons an arrestee may possess and to secure evidence. United States v. Davis, 997 F.3d 191, 195 (4th Cir. 2021).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where

its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

## B. Analysis

In the case at bar, the necessary sequential analysis is as follows. The first issue is whether the 911 call was presumptively reliable such that law enforcement was justified in stopping Defendant on the basis of information conveyed by the caller. The second issue is whether officers had reasonable, articulable suspicion to stop Defendant even though officers themselves did not witness or perceive criminal activity (i.e. hear shots fired).

### 1. Reliability of the 911 Call

In his motion, Defendant points to the lack of information about the 911 caller. The implication here is that an anonymous 911 caller could make mischief, or worse, by providing false information to law enforcement. However, it appears that Defendant may not have had the benefit of the CAD report or the information contained within it at the time of making his motion. At the hearing before the undersigned, with witness explanation of the CAD report, it was clear that dispatch obtained the caller's name and telephone number, and contemporaneously logged that information into the platform by which CAD reports are maintained. With that, the call was not anonymous to law enforcement. Thus, the call and the information conveyed thereby had indicia of reliability. What is more, at least one officer responding to the call – Arthurs – had real-time access to the CAD report. In her patrol vehicle, Arthurs had an electronic device by which she could view the CAD report as it was being generated. Thus, ultimately, if the 911 caller had provided false information or otherwise sought to create problems for those involved here, all

indications are that law enforcement could have responded accordingly to hold the caller accountable.[4]

On a related note, the information conveyed by the call, and law enforcement's response to it, ultimately were appropriate in the circumstances. The undersigned finds all of the MPD officers who testified to be absolutely credible in their respective versions of events. In addition, their testimony about the timeframes and locations of events (as well as about Defendant's race, gender, and attire) is supported by the body camera footage contained within exhibits introduced at the suppression hearing. And more particularly, all of the MPD officers who testified (1) were in the downtown Morgantown area when they heard the report from dispatch about the 911 call concerning shots fired and (2) responded immediately and were on the scene within minutes. Moreover, the 911 caller's description of the subject was specific such that MPD officers who testified each independently saw Defendant, who matched this description. And they saw Defendant within mere minutes of the 911 call, only a short distance – approximately one and one-half blocks – of the location which the 911 caller reported. The officers did not testify about seeing any other black male wearing a tan shirt as they observed the downtown Morgantown area. This only supports the reliability of the 911 call. All of this gives rise to reasonable, articulable suspicion for officers here to have stopped Defendant.

The undersigned also is persuaded on this point by Hasley's account of events. En route to the location where he had seen Defendant standing, Hasley stopped in a CVS parking lot to have another officer accompany him. In that moment, an individual approached Hasley in his patrol vehicle to report that a person who was a black male wearing a tan shirt had been waving a gun.

---

[4] In its response brief [ECF No. 35], the Government makes alternative argument about how officers had reasonable, articulable suspicion to conduct a Terry frisk even if the Court would find the 911 call to be anonymous. However, the undersigned does not analyze this argument further because the undersigned does not find the 911 call to be anonymous.

This corroborated the information conveyed by the 911 caller about a black male wearing a tan shirt being the person firing a gun. Additionally, the undersigned agrees with Hasley that the person who approached his patrol vehicle likely was not the same person as the caller to 911, given that the 911 caller reported shots fired by the subject and that the person in the CVS parking lot reported the subject waving a gun around. This further corroborates the 911 caller and is even greater indicia of reliability of the information the caller conveyed.

As a related matter, Defendant emphasizes that when Arthurs was approaching Defendant on foot on Wall Street, she did not report to officers at the other end of Wall Street that Defendant suspiciously turned away from her and Bradford and walked in the opposite direction. Thus, the argument goes, this undercuts any reasonable, articulable suspicion that those officers had when detaining Defendant. The undersigned is unpersuaded. As set forth above, there was reasonable, articulable suspicion to have stopped Defendant even absent Arthur's colleagues not having the information about Defendant turning away from her and briskly walking away. Nonetheless, at the suppression hearing, Trump testified about how he was positioned at the end of Wall Street opposite Arthurs and Bradford, observed Defendant walking away from those officers, and found this to be suspicious behavior. This undercuts Defendant's argument on this point.

Finally, the Government argues, interestingly, that there is not necessarily a <u>Terry</u> stop about which to argue here. The testimony and evidence demonstrate that officers were unable to effect a <u>Terry</u> frisk because Defendant was so uncooperative. Thus, the situation evolved to an arrest of Defendant based upon his intoxication and lack of cooperation with officers. It was the search incident to this arrest, and not a <u>Terry</u> frisk, by which officers recovered the items from Defendant's person giving rise to the Indictment here. Based upon the undersigned's review of the record and testimony and evidence received at the suppression hearing, this is accurate so far as it

goes. However, it is necessary to analyze whether officers reasonable, articulable suspicion for at least an *attempted* Terry stop, even if such a stop could not occur. After all, the search incident to arrest ultimately arose from that *attempted* Terry stop. And to be clear, officers did have such reasonable, articulable suspicion.

Thus, the undersigned **FINDS** that the 911 call here was reliable such that law enforcement rationally and appropriately relied on it, and that there was reasonable, articulable suspicion for officers to stop Defendant for a Terry frisk (or at least an attempted frisk).

### 2. Lack of Firsthand Observation by Responding Officers

Defendant notes that no officer in the vicinity of the shots fired said that they themselves heard shots. Defendant emphasizes Hasley's testimony that he was surprised to not hear the shots at his location. However, this argument does not persuade the undersigned. The area of downtown Morgantown where these events occurred is, per witness testimony at the suppression hearing, a heavily-built environment in which a number of restaurants, bars, and shops are located. Presumably, then, it also is a place with associated ambient noise (e.g. traffic, utilities, heating/cooling systems, officers' own patrol vehicles), even in the early morning hours. In other words, it is not open space free of obstructions to sound – even a dramatic sound like a gunshot.

In addition, Defendant cites no legal authority for the proposition that officers themselves must witness or otherwise perceive criminal activity in order to have reasonable, articulable suspicion for a Terry stop. And the undersigned is aware of no such authority. Caselaw in our Fourth Circuit and elsewhere tends to focus not on outright prohibition of law enforcement relying on third party reports of criminal activity. Rather, caselaw focuses on the degree to which law enforcement is permitted to rely on such reports. As the Government notes, "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in

time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch." United States v. Mitchell, 963 F.3d 385, 391 (4th Cir. 2020) (citation and quotation omitted). Thus, Defendant's argument is lacking on this point.

In sum, the undersigned **FINDS** that officers had reasonable, articulable suspicion to stop Defendant for a Terry frisk (or at least an attempted frisk) even absent officers themselves observing criminal activity.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [ECF No. 31] be **DENIED.**

Any party may, **on or before September 28, 2021,**[5] file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

---

[5] Although parties usually have 14 days to respond to a Report and Recommendation such as this, that is a maximum time to respond, not a minimum. In this matter, the pretrial conference is scheduled for October 1, 2021 and the jury selection and trial for October 12, 2021.

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted September 23, 2021.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE